**Robert G. GODFREY, Appellant,**

v.

**Jesse BROWN, Secretary of Veterans Affairs, Appellee.**

No. 94–169.

United States Court of Veterans Appeals.

Aug. 9, 1995.

Dennis J.C. Owens, Kansas City, MO, was on the brief for the appellant.

Mary Lou Keener, General Counsel; Norman G. Cooper, Assistant General Counsel; David W. Engel, Deputy Assistant General Counsel; and Ralph G. Davis, Washington, DC, were on the brief for the appellee.

Before MANKIN, IVERS, and STEINBERG, Judges.

MANKIN, Judge, filed the opinion of the Court, in which IVERS, Judge, joined. STEINBERG, Judge, filed a dissenting opinion.

MANKIN, Judge:

On September 10, 1990, the Board of Veterans' Appeals (BVA or Board) denied Robert G. Godfrey (appellant) service connection for bilateral hearing loss. The appellant sought reversal of this decision with this Court and on April 15, 1992, we vacated and remanded the matter for further consideration. *Godfrey v. Derwinski,* 2 Vet.App. 352 (1992) (hereinafter *Godfrey I* ). On remand, the BVA, in a January 28, 1994, decision denied the appellant's claim for entitlement to service connection for defective hearing and tinnitus. Record (R.) at 8. The appellant filed a timely appeal to this Court on February 28, 1994. For the reasons set forth below, the Court will affirm the Board's January 28, 1994, decision.

## I. BACKGROUND

We will first summarize the facts previously before the Court and the Court's conclusions in *Godfrey I,* and will then address the Board's treatment of those conclusions in the decision that is now before us.

### A. *Godfrey I*

The appellant appealed the BVA's September 10, 1990, denial of his claim for service connection for bilateral hearing loss. *Robert G. Godfrey,* BVA 90–25963 (September 10, 1990). He claimed that the hearing loss resulted from his work in the United States Army as a weapons and explosives instructor during his first period of enlistment from September 13, 1945, until his discharge for purposes of immediate reenlistment on April 19, 1946. R. at 9. The appellant contended that during his first enlistment, he worked without hearing protection in a basic training unit where he was repeatedly exposed to acoustic trauma from firearms and explosives over a period of several months. R. at 2, 9. The record on appeal neither confirms nor denies the appellant's assertion that he participated in weapons systems instruction for seven months after basic training—his military occupational specialty during this period was listed as "[b]asic." R. at 12, 23. The appellant contended that in this capacity, he suffered hearing loss, pain, and tinnitus on numerous occasions, which improved only after a few weeks away from the range. R. at 7. The appellant stated that he sought treatment for his condition but was told his only resort was to avoid noise exposure. R. at 7.

The appellant was discharged, and he reenlisted as a surgical technician where he served from April 19, 1946, to May 22, 1947. R. at 9. With the exception of the appellant's separation examination, his service medical records (SMRs) were unavailable because they were destroyed in the 1973 fire at the National Personnel Records Center (NPRC) in St. Louis. *Godfrey I,* at 356. The Board concluded that there was no evidence that the appellant experienced hearing loss during service. *Id.*

On appeal, this Court found that the BVA's decision was defective because it: (1) misstated the legal standard used to determine service connection; and (2) disregarded the arguably doubtful credibility of the appellant's separation physical. *Id.* at 356–57. As to the Court's first finding, the Court held that the BVA misinterpreted the law when it treated the lack of evidence that the appellant experienced hearing loss during service as dispositive of his claim. *Id.* at 356. The Court held that in order to establish service connection, the appellant did not have to

show hearing loss was present during service, but instead, was only required to show that hearing loss resulted from personal injury in service. *Id.* With respect to the Court's second finding, the Court found that the Board erred by not discussing the appellant's attack on the credibility of his separation physical. *Id.* at 356–57. As a consequence, the Court remanded the case to the BVA for further adjudication. *Id.* at 357.

### B. Post–Remand Proceedings

In response to the Court's opinion in *Godfrey I,* on September 9, 1992, the Board remanded the case to the regional office (RO) for further development. R. at 209. On remand, the appellant argued that: (1) in some cases, progressive hearing loss may occur after cessation of exposure to noise; and (2) hearing loss is not noticeable after apparent recovery from the more severe temporary damage resulting from initial noise trauma. R. at 11, 243. In support of these theories, the appellant submitted a March 13, 1991, letter (R. at 106) and an April 29, 1991, (R. at 109) letter from a Dr. Larry A. Hoover who treated the appellant for a sensorineural hearing loss. R. at 283.

In his March 13, 1991, letter, Dr. Hoover mentioned the appellant's noise injury that occurred when he served as a weapons instructor on active duty. R. at 106. Dr. Hoover opined that there was significant inner ear damage from the explosions the appellant was exposed to during service because of the

> persistent tinnitus since [service].... Additional evidence of [noise exposure] is the fact that [the appellant] had multiple episodes of transient threshold shifts with ear fullness, decreased hearing, and associated severe tinnitus [since the appellant's departure from the service].... [T]he particular configuration of [the appellant's] hearing loss, that is, with it being relatively normal at the lower frequencies with a severe loss from 2000 hertz on up, is also very consistent with noise exposure.

R. at 106.

The RO denied the appellant's claim because Dr. Hoover relied on the appellant's history of what occurred. R. at 244. The RO further related that while the appellant's statements regarding occurrences of acute hearing problems while in the military were accepted as factual, service connection was not warranted because of the lack of complaints regarding a hearing disorder on the separation examination combined with the lack of post-service medical evidence until 1980 (which failed to find tinnitus). R. at 238–39. The appellant disagreed with this decision and appealed to the BVA. R. at 229, 254.

In accordance with this Court's holding in *Thurber v. Brown,* 5 Vet.App. 119, 126 (1993) (before BVA can rely on any evidence developed after the issuance of the most recent statement of the case, the Board must give the veteran notice of the evidence and of the reliance proposed to be placed on it, and a reasonable opportunity to respond thereto), the BVA notified the appellant on July 15, 1993, of the additional evidence it would consider in rendering a decision. R. at 259–67. The Board's evidence, a text on occupational hearing loss, reflected that the appellant's first theory, regarding progressive hearing loss after the cessation of noise, was under attack in the medical community (R. at 11, 265, 286); P.W. Alberti, "Occupational Hearing Loss," in DISEASES OF THE NOSE, THROAT, EAR, HEAD AND NECK 1059 (J.J. Ballenger, ed., 14th ed. 1991) [hereinafter "Ballenger"].

In response, the appellant submitted a letter from Dr. Alberti wherein the doctor stated that noise-induced hearing loss (NIHL) and tinnitus "may be caused by a short term exposure to noise.... [S]ome people[,] after only one or two episodes of shooting[,] develop a permanent [NIHL] notch and certainly tinnitus, which may be temporary or permanent. It is not only possible, but I believe frequent[,] that someone with an early [NIHL] has no symptoms related to the hearing loss. The only way to tell an early loss is by Audiometry." R. at 271. However, Dr. Alberti also stated that he did not believe in the appellant's first theory—that damage from noise is progressive after the noise exposure finishes. R. at 272. Rather, Dr. Alberti stated that the relationship between early NIHL and later symptoms can

be explained by the following "additive theory":

> The additional hair cells lost from aging experienced in the 40'[s], 50's and upwards when added to pre existing [sic] hearing loss from noise produces symptoms which are much greater than if there had been no hearing loss (even an asymptomatic one, from the noise). In other words, the effect of noise and aging is generally considered *to be additive except with very severe loss* [sic] hearing losses. Put yet another way, the hearing loss from aging occurs on a different baseline in a noise damaged ear than in a normal ear and handicapping levels of hearing loss are experienced sooner than had there been no noise exposure.

R. at 271. Dr. Alberti added that he was unable to comment further on the appellant's case without further clinical details. R. at 272.

In further support of his claim, the appellant submitted a letter from Gregory A. Ator, M.D. R. at 282–83. Like Dr. Hoover, Dr. Ator focussed on the configuration of the appellant's audiograms when he concluded that "it is clear that [the appellant] has had a significant noise exposure as the audiometric profile is very consistent with this process." R. at 283. Dr. Ator also commented that the lack of evidence of "subsequent occupational noise exposure precludes damage being done subsequent to [the appellant's] military career." R. at 283. Regarding the second theory advanced by the appellant, Dr. Ator stated: "I think the whole issue of whether *or not a sensorineural hearing loss produced from noise injury has to manifest itself at the time of the injury is far from clear.* The magnitude of the loss produced in the short term, if any, would unlikely have been of sufficient magnitude [sic] to be picked up by the cursory discharge audiometric test that the patient had." R. at 283.

The appellant presented additional evidence in the form of a hearing profile characterized by a "V notch" that is indicative of acoustic trauma, in contrast to a declining straight line profile which is characteristic of hearing loss attributable to old age. R. at 291. In further support of his claim, the appellant submitted numerous medical treatises (R. at 148–72; 296–431) relating to acoustic trauma and hearing loss, including NIHL, to support his assertion that noise exposure (to include percussion from small arms fire) causes hearing loss, and that prolonged exposure can cause irreversible damage. R. at 11.

On remand, the BVA, in a January 28, 1994, decision, continued its denial of the appellant's claim after determining that his separation physical was credible. R. at 8, 12–13. *Robert G. Godfrey,* BVA 94–00882 (Jan. 28, 1994). While the BVA accepted the appellant's contention "[t]hat he was a weapons instructor for at least part of his initial 7–month tour of duty", it found less credible his contentions "that he had numerous temporary threshold shifts with accompanying pain or fullness and severe tinnitus in service, followed by persistent tinnitus continuing after service." R. at 17. The Board also noted that the appellant's bilateral hearing loss was not diagnosed until he underwent an audiological examination in 1980—thirty-three years after his separation from military service in 1947. R. at 9, 13. The appellant waited until 1989, when he was again diagnosed with hearing loss in both ears and given hearing aids, to file a claim for service connection. R. at 8, 10, 35. Neither the 1980 or the 1989 examination reported a finding of the tinnitus the appellant stated he suffered from continuously for thirty years. R. at 9, 10, 32, 35. Because of the absence of hearing disorder complaints on the appellant's separation examination and for many years after service, the Board concluded that there was not an approximate balance of the evidence (*Gilbert v. Derwinski,* 1 Vet.App. 49, 53 (1990)), and that the preponderance of the evidence was against finding that hearing loss and tinnitus were due to service. R. at 17–18. The Board further found that private physician statements had diminished probative value because their diagnoses relied on a medical history as related by the appellant as well as on recent audiograms which reflected "a configuration ... merely consistent with, *not diagnostic of,* NIHL." (Emphasis added.) R. at 16. A timely appeal to this Court followed.

## II. ANALYSIS

Section 3.385 in 38 C.F.R. (1994) sets forth the specific requirements regarding hearing disorders. At the time of the BVA decision in January 1994, 38 C.F.R. § 3.385 (effective April 3, 1990) stated that hearing loss does not constitute a disability for the purposes of service connection by the VA when the threshold levels at 500, 1000, 2000, 3000, and 4000 Hertz are all less than 40 decibels. *See* 38 C.F.R. § 3.385 (1993). At the appellant's separation examination in April 1947, the appellant's hearing was 15/15 bilateral, using the whispered voice test, with no ear abnormalities noted. R. at 29. However, VA regulations do not address hearing loss as determined by a whispered voice test, but instead as measured by audiograms, which were not available at the time of the appellant's discharge from service. R. at 289.

In *Hensley v. Brown*, 5 Vet.App. 155, 159 (1993), the Court held that section 3.385 does not preclude service connection for a current hearing disability where the appellant submits "evidence that the current disability is causally related to service." *Hensley*, 5 Vet. App. at 160. *See also, Cuevas v. Principi*, 3 Vet.App. 542, 548 (1992) (in order for the appellant to establish service connection for hearing loss of his left ear, there must be not only a current disability, but also a determination of a relationship between that disability and an injury or disease incurred in service or some other manifestation of the disability during service).

As Congress indicated in 1941, the question of service connection is a question of fact to be determined "upon the evidence in each individual case." H.R.REP. No. 1157, 77th Cong., 1st Sess. (1941), reprinted in 1941 U.S.C.C.A.N. 1035. This Court will not overturn the BVA's factual findings unless they are "clearly erroneous." 38 U.S.C. § 7261(a)(4); *Gilbert*, 1 Vet.App. at 52–53; *Francisco v. Brown*, 7 Vet.App. 55, 57 (1994). Under this standard of review, "if there is a 'plausible' basis in the record for the factual determinations of the BVA, even if this Court might not have reached the same factual determinations, [the Court] cannot overturn them." *Gilbert*, 1 Vet.App. at 53. The Board is required to provide a written state-ment of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable an appellant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Simon v. Derwinski*, 2 Vet. App. 621, 622 (1992); *Masors v. Derwinski*, 2 Vet.App. 181, 188 (1992); *Gilbert*, 1 Vet.App. at 57. To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the veteran. *See Gabrielson v. Brown*, 7 Vet.App. 36, 39–40 (1994); *Abernathy v. Principi*, 3 Vet.App. 461, 465 (1992); *Simon, supra; Peyton v. Derwinski*, 1 Vet.App. 282, 285 (1991); *Hatlestad v. Derwinski*, 1 Vet. App. 164, 169 (1991); *Gilbert, supra*. When SMRs have been destroyed, the Board has a heightened obligation to provide an explanation of reasons or bases for its findings and to consider the benefit-of-the-doubt rule under 38 U.S.C. § 5107(b). *O'Hare v. Derwinski*, 1 Vet.App. 365, 367 (1991). For the reasons set forth below, the Court holds that the Board's findings of fact in this case have a plausible basis in the record and are not subject to reversal as being clearly erroneous.

### A. Separation Examination

As noted earlier, with the exception of his separation physical, the remainder of the appellant's records were destroyed in the 1973 NPRC fire. *Godfrey I*, at 356. The appellant has repeatedly challenged both the existence and accuracy of his separation examination. R. at 12. On remand, this Court ordered the Board to make express findings as to the probative value of the separation physical report and to ensure that its conclusions were supported by an adequate statement of reasons or bases. *Id.* at 357.

The Board found the appellant's separation examination to be credible—a factual finding that this Court must accept unless it finds it to be clearly erroneous. R. at 12–13. *See Burger v. Brown*, 5 Vet.App. 340, 342–43

(1993). While the appellant did not recall receiving a separation examination, he did recall that a clerk asked him a few questions and told him that if he were to mention any disabilities upon outprocessing, he would be placed in a hospital for observation and his separation would be delayed. R. at 7, 12. The Board noted that while it was credible that the appellant was exposed to noise in service, it was not credible that he would not have mentioned it at his separation exam, especially given the fact that the medical history portion of the separation examination related that the appellant: suffered a fractured right radius in 1937; underwent a tonsillectomy in 1940; and fractured a toe in 1942. R. at 12.

The record of the separation physical showed that the appellant's hearing was normal upon examination using the whispered voice test. R. at 29. The examination also documented 20/20 uncorrected visual acuity in each eye with no eye abnormalities. R. at 29. However, there is uncontroverted evidence that the appellant

suffered from a lifelong vision impairment. [The appellant] contended that such evidence would show that, notwithstanding the notation of 20/20 uncorrected vision in the 1947 record of his separation physical, an accurate examination could not have found him to have normal vision at the time of his discharge; therefore, the entire report, including the 'whisper test' results indicative of normal hearing, was highly suspect.

*Godfrey I,* at 354. The appellant contended that the fact that his separation eye examination results were incorrect supports his contention that no separation examination took place and that it consequently follows that the reported hearing test results are suspect. R. at 242. The appellant therefore believes that the examination report has no value and that it should be purged from the record on appeal. R. at 7.

The appellant further contended that even if the separation examination did take place, it would not have been able to detect high frequency hearing loss without an audiologic examination that included an audiogram. R. at 99. Regarding the reliability of a hearing examination by whisper test at fifteen feet, the appellant submitted evidence from Dr. Hoover wherein he opined that it

is obviously a very unreliable way to test hearing, especially in patients whose hearing loss is not symmetrical, i.e. where there is more loss in one region than another, as is the case in your particular situation. It is my professional opinion, as an otolaryngologist practicing now for fifteen years, that such testing would provide no reliable information regarding the presence or absence of severe noise-induced, primarily upper frequency hearing loss.

R. at 109. Dr. Ator commented in his September 9, 1993, dictation regarding this case, that

[t]he status of [the appellant's] hearing at the conclusion of his military career is far from clear given the cursory discharge audiometric examination that he had.... The magnitude of the loss produced in the short term, if any, would unlikely have been of sufficient magnitude to be picked up by the cursory discharge audiometric test that the patient had.

R. at 283.

This Court may not overturn the Board's findings regarding the credibility or probative value accorded the separation examination absent clear error. *See Lizaso v. Brown,* 5 Vet.App. 380, 386 (1993) (it is the Board's function, and not that of the Court, to determine the credibility and authenticity of documents in question); *Ohland v. Derwinski,* 1 Vet.App. 147, 149–50 (1991) (remanded in part for failure of the BVA to analyze the credibility or probative value of the evidence). The Court finds the Board's determination that the separation examination took place and was credible to be plausible. While the Board agreed that the appellant's visual acuity was misstated, it cited numerous reasons why the separation examination report was still credible and should be regarded as more than just cursory: (1) it accurately reflected the appellant's childhood medical history; (2) it contained pertinent personal data regarding the appellant's weight, height, and blood pressure which the appellant admits was correct (Appellant's Brief (Br.) at 3); and (3) it indicates that an

x-ray of the appellant's chest was taken. R. at 29.

The Board conceded that the whispered voice test "cannot detect hearing loss with anywhere near the precision of an audiogram," but stated that what was of particular importance was that the separation examination did not mention hearing loss or tinnitus despite the fact that just one year prior, these problems prompted the appellant to seek reassignment into a different career field. R. at 12–13, 29. The Court finds that the fact that the separation examination report is silent as to any complaints of a hearing disorder enhances the Board's finding that the report is indeed credible.

### B. Appellant's Theories of Service Connection

On remand, the appellant argued that: (1) in some cases, progressive hearing loss may occur after cessation of exposure to noise; and (2) hearing loss is not noticeable after apparent recovery from the more severe temporary damage resulting from initial noise trauma. R. at 11, 243.

### 1. Theory #1

■ The Court finds that the appellant's first theory of causation is not supported by the evidence. Dr. Alberti's letter noted that "damage from noise exposure is not progressive after the exposure ceases." R. at 271–72. Dr. Alberti's letter also stated that hearing loss appeared to be cumulative with other factors such as advancing age. R. at 271–72. The Board specifically relied on Dr. Alberti's statement that "one should avoid the statistical epidemiologic error of believing that noise exposure and hearing loss are necessarily causally related. To believe this is to believe that working in noise protects one from all other forms of ear disease." Ballenger at 1060. R. at 13–14, 266. While Dr. Alberti stated that the relationship between early NIHL and later symptoms can be explained by an "additive theory," he failed to make any explicit conclusions regarding the appellant's case. R. at 271.

### 2. Theory #2

■ The appellant's second theory concerning his hearing loss is that NIHL was not noticeable for many years after exposure to acoustic trauma. Appellant's Br. at 13. The appellant stated that while he had severe hearing loss at the higher frequencies ever since noise exposure in service, he and his family and friends have only become aware of it recently because of the additive effects of aging. R. at 287. He further stated that any hearing recovery that he experienced was "more apparent than real." R. at 287. The appellant submitted a television news documentary on hearing disorders that indicated that many years can go by before noise-inflicted damage becomes obvious. R. at 113–15. The appellant also submitted a letter from Dr. Alberti wherein he stated that it is not only possible, but frequent, that someone with early NIHL has no symptoms related to the hearing loss. R. at 271. Dr. Ator also opined:

> I think the whole issue of whether or not sensorial hearing loss produced from noise injury has to manifest at the time of injury is far from clear. The magnitude of the loss produced in the short term, if any, would unlikely have been of sufficient magnitude [sic] to be picked up by the cursory discharge audiometric test that the patient had.

R. at 283.

The BVA found that the appellant's second theory regarding hearing loss was not sustainable because: (1) there was insufficient evidence to rule out other causes for the appellant's current condition; (2) private medical statements submitted by the appellant had little probative value because they relied on medical history as relayed by the appellant; and (3) the private medical statements were undermined by medical literature. Secretary's Br. at 13.

#### a. Other Sources

■ Regarding the BVA's first point, the Court notes that the Board cited to other possible sources of the appellant's hearing loss such as presbycusis (a "lessening of hearing acuteness resulting from degenerative changes in the ear that occur esp[ecially]

in old age." WEBSTER'S MEDICAL DESK DICTIONARY 572 (1986)) and diabetes. R. at 14. The Board's views are speculative and unsupported by any clinical evidence, thus, the Court is not placing its reliance on them. *Black v. Brown*, 5 Vet.App. 177, 180 (1993).

### b. Testimony

■ Of record is medical evidence from two private physicians in 1991 (Dr. Hoover) and 1993 (Dr. Ator). The BVA must determine the value and credibility of this evidence. *Smith v. Derwinski*, 1 Vet.App. 235, 237 (1991) (determining the credibility of evidence is a function of the BVA); *Ohland*, 1 Vet.App. at 149. The Court notes that the BVA has not ignored these physicians' opinions. The Board found that these private physician statements had diminished probative value because their diagnoses relied on a medical history as related by the appellant as well as on recent audiograms which reflected "a configuration ... merely consistent with, *not diagnostic of*, NIHL." (Emphasis added.) R. at 16.

■ The Board is not required to accept doctors' opinions that are based upon the appellant's recitation of medical history. *See e.g., Owens v. Brown*, 7 Vet.App. 429 (1995) (Board not required to accept uncorroborated testimony of claimant as to dental treatment during service; Board not bound to accept physicians' opinions based on claimant's recitation of events). *See also Elkins v. Brown*, 5 Vet.App. 474, 478 (1993) (rejecting medical opinion as "immaterial" where there was no indication that the physician reviewed claimant's SMRs or any other relevant documents which would have enabled him to form an opinion on service connection on an independent basis); *Swann v. Brown*, 5 Vet.App. 229 (1993) (holding that the BVA was not required to accept the medical opinions of two doctors who rendered diagnoses of post-traumatic stress disorder almost twenty years after claimant's separation from service and who relied on history as related by the appellant as the basis for those diagnoses); *Heuer v. Brown*, 7 Vet.App. 379, 386–87 (1995) (to demonstrate entitlement to service connection for hearing loss, there must be medical evidence indicating a nexus

to service, and where the condition was noted during service, continued symptomatology can aid in establishing service connection).

Both Dr. Hoover and Dr. Ator ascribed the appellant's hearing loss to military noise exposure. R. at 106, 109, 283. It appears that both doctors relied on the appellant's recitation of medical history. (While the appellant is a medical doctor, there is no evidence that he is also a specialist in the relevant field.) Our dissenting colleague clearly does not agree with our position and his dissenting opinion speaks for itself. His response flies in the face of this Court's existing jurisprudence.

Dr. Ator relied on the appellant's uncorroborated statements when he concluded that the lack of evidence of "subsequent occupational noise exposure precludes damage being done subsequent to [the appellant's] military career." R. at 283. (The Court questions how Dr. Ator could have concluded that the appellant's noise exposure was "fully documented during his military career" (R. at 283) when all of the appellant's SMRs, with the exception of his separation examination, were unavailable for review.)

■ The Board must provide reasons or bases for not accepting testimony and must make medical conclusions based on independent medical evidence. *Colvin v. Derwinski*, 1 Vet.App. 171, 175 (1991). While Doctors Hoover and Ator corroborated the appellant's history of noise exposure with audiogram records upon which they based their medical conclusions (R. at 106, 109, 283), and while the Board agreed that the 1980 and 1989 audiological examinations reflected a configuration consistent with NIHL, the Board noted:

> [T]he diagnosis [of NIHL] is based on history, physical examination, and appropriate laboratory tests including full hearing tests. Although there are audiometric configurations *suggestive* of the diagnosis, it may have many variations, and *no one configuration* fits all cases or *excludes a case*. To compound matters, NIHL, like any other chronic disorder, may coexist with other lesions. The diagnosis, which is circumstantial, is largely based on a care-

ful history and is frequently made by exclusion, i.e., *if other causes of hearing loss have been excluded,* noise exposure has been adequate, and there is an appropriate hearing loss, it is customary to attribute the loss to that cause. The diagnosis must be made individually, and one should avoid the statistical epidemiologic error of believing that noise exposure and hearing loss are necessarily causally related. To believe this is to believe that working in noise protects one from all other forms of ear disease.

R. at 13–14, 266. Ballenger at 1060 (emphasis added). The Board thus had a plausible basis for finding the doctor's statements unpersuasive. Although the Board conceded that the appellant's separation examination was insufficient to detect the type of hearing loss the appellant alleged that he suffered during service, the separation examination was also silent as to any complaints of noise trauma suffered during service. Consequently, it is not only the appellant's recitation of events but also the fact that the appellant cannot submit any contemporaneous evidence of noise trauma that undermines the physicians' opinions. The dissent argues that we have extended the reach of *Owens* and *Elkins* so as to bar the introduction of medical opinions from physicians in cases where SMRs are missing unless the physicians involved have personally witnessed the occurrence of the alleged events during service or reviewed SMRs. That is not the case here. On the facts of this case, the Board examined the bases for the physicians' opinions and rejected their probative value. That is a function for the Board, and we cannot substitute our own judgment for that of the Board on matters involving probative weight or credibility. *See Lizaso, Ohland, Smith,* all *supra* [cases regarding the BVA's function on credibility].

Dr. Ator also asserted that "[t]he lack of any subsequent *occupational* noise exposure precludes damage being done subsequent to [the appellant's] military career." (Emphasis added.) R. at 283. In making this statement, Dr. Ator again relied on the appellant's version of his medical history. The Board, while not conclusively stating that the appellant was exposed to these other sources, cites

to numerous *non*-occupational environmental types of noise exposure that can induce hearing loss such as "power mowers, chain saws, loud voices, sirens, thunderclaps, jet planes, trains, even air conditioner units, auto traffic, vacuum cleaners, and other household appliances.... Medical equipment such as suction units, respirators, and incubators can produce intense sounds." R. at 16, 306. R.J. McCunney, "Occupational Exposure to Noise," in *Environmental and Occupational Medicine* 1125 (W.N.Rom, 2d ed., 1992). Thus, not only does Dr. Ator rely on unsubstantiated testimony in making his statement, but he also fails to account for the fact that *non*-occupational noise exposure can cause hearing loss also.

### c. Medical Evidence

■ Under the facts and circumstances of this case, the medical evidence relied upon by the Board rebuts the evidence set forth by the appellant. The Board explicitly found that "the authorities relied upon by the veteran do not stand for his assertion that noise exposure can result in temporary threshold shifts, which then disappear, and then result in a permanent threshold shift first noticeable many years after the noise exposure has ceased, with subsequent continued worsening." R. at 14.

The Board's medical research did not support the appellant's proposition that a permanent threshold shift can first appear years after the noise exposure has ceased. In support of its findings, the Board cited to Ballenger:

> It is frequently asked if hearing loss from noise exposure can progress after removal from noise. Although it is generally accepted that hearing loss improves rather than worsens after removal from chronic noise exposure, there is considerable controversy in the literature about the interaction between noise, presbycusis, and progress of hearing loss. The overwhelming body of opinion, however, strongly suggests that hearing loss that progresses after removal from noise exposure is from some other cause.

R. at 15, 265. Ballenger at 1059.

The Board's findings rest upon medical literature that is scientific in nature and is

therefore not an impermissible expression of the Board's own medical conclusions. The medical literature does not support the appellant's contention that part of his hearing loss was attributable to in-service noise trauma. Rather, as this medical treatise explained, hearing loss generally improves after removal from chronic noise exposure and subsequent manifestations of hearing loss are wholly attributable to some other subsequent source. Indeed, the appellant stated that his hearing improved upon removal from noise exposure. R. at 48.

While the BVA accepted the appellant's contention that he was a weapons instructor for at least part of his initial seven-month tour of duty, it is less clear that the appellant was treated for hearing loss during his tour of duty. The NPRC informed the RO in November 1989 that the appellant's SMRs were destroyed in the 1973 fire and that daily sick reports for the training battalion that the appellant was assigned to were not available in 1946. R. at 69. However, the battalion's morning reports for the period from April 1, 1946 through June 30, 1946, were located but contained no reference that the appellant was ever sick, injured, or hospitalized. R. at 69.

The appellant contended that while his hearing improved a great deal after his duties involving firearms ended, the tinnitus persisted, although it was less severe. R. at 48. After discharge, the appellant stated that the tinnitus became worse without further noise damage and his high frequency hearing became impaired in the 1970's. R. at 48. However, there is no evidence of tinnitus either at separation from service or on the appellant's audiological examinations in 1980 or 1989. This lack of complaints of tinnitus undermines the appellant's contentions regarding the persistence of tinnitus. Interestingly, while the appellant stated that his hearing loss had improved considerably by the time he left the service, he also stated that his tinnitus worsened after separation from service even though he had not been exposed to noise trauma subsequent to his in-service occupation as a weapons instructor for seven months. R. at 9, 10, 32, 35.

The dissent overemphasizes the medical treatises standing for the proposition that in-service hearing loss would be magnified over time because of the effects of aging. As the dissent readily states, the medical treatises and statements would support the argument that in-service noise trauma created a hearing loss *which was not noticeable at that time* and that subsequent aging effects, when added to the in-service NIHL, caused an earlier and more pronounced manifestation of hearing loss. However, the dissent fails to recognize that the appellant is in fact arguing that he experienced a *noticeable* hearing loss during service, which eventually improved by separation. Thus, the appellant's own statements serve to distinguish his claim from the type of hearing loss being described by the physicians and treatises.

Reviewing under the clearly erroneous standard, the Court does not find that the BVA decision is lacking a plausible basis in the record. *See Gilbert, supra.* The Court notes the absence of complaints regarding a hearing disorder at the time of the separation examination and the lack of evidence of post-service treatment until the first objective medical evidence of hearing loss is established thirty-three years later, combined with the medical treatises' undermining of the appellant's evidence and contentions that the Board relied upon under the circumstances of this case; these factors do provide a plausible basis for the BVA's credibility findings regarding the history of hearing loss as related by the appellant and for the denial of entitlement to service connection for defective hearing and tinnitus.

### III. CONCLUSION

Upon consideration of the record and the parties' briefs, the Court holds that the appellant has not demonstrated that the BVA committed error—in its findings of fact, conclusions of law, procedural processes, articulation of reasons or bases, or application of the benefit-of-the-doubt rule—that would warrant remand or reversal under 38 U.S.C. §§ 7252, 5107(a), (b), 7104(d)(1), 7261, and the analysis in *Gilbert, supra.* The Court affirms the January 28, 1994, decision of the Board.

STEINBERG, Judge, dissenting.

I am unable to join in the opinion of the majority affirming the Board of Veterans' Appeals (BVA or Board) decision. My basic disagreement is with the portion of the Board decision rejecting the appellant's Theory # 2 for service connection of his hearing loss. The appellant's Theory # 2 is that his hearing was damaged during service in such a way that only a sophisticated test would have detected the damage at that time; that hearing loss was not noticeable to him at separation from service; and that it took the passage of many years before his service-incurred hearing damage manifested as noticeable hearing loss.[1] The majority opinion is based on an unwarranted and unstated extension of the Court's holdings in *Owens v. Brown*, 7 Vet.App. 429 (1995), and *Elkins v. Brown*, 5 Vet.App. 474 (1993), and other Court jurisprudence.

I also have reservations about the majority's affirmance of the BVA decision in regard to the appellant's Theory # 1 (that in some cases, progressive hearing loss may occur after cessation of exposure to noise), given the BVA's mischaracterization of the treatise evidence it cited.[2] I would thus remand that question as well since I believe remand is required as to Theory # 2. However, if, as I believe should be done (*see* part II.A. *infra* ), the Court were to reverse the Board on Theory # 2 and direct the award of service connection, then the Court would not be called upon to address Theory # 1.

## I. Majority Opinion

*A. Medical history.* The majority states that in the instant case the Board determined that the two experts who had reviewed the veteran's records, Drs. Hoover and Ator, "relied on a medical history as related by the appellant", and then states: "The Board is not required to accept doctors' opinions that are based upon the appellant's recitation of medical history." *Ante* at 121. Our cases have never before explicitly held that the Board may reject physicians' opinions merely because they "are based upon the appellant's recitation of medical history".

The majority cites several cases, including *Owens* and *Elkins*, both *supra*, as support for such a proposition, but none of those cases actually held that the BVA is free to disregard a physician's statement that is based on an appellant's history. *Owens* does state:

The BVA was not bound to accept the appellant's uncorroborated testimony that teeth numbered 3, 4, 15, and 18 were removed in service, nor was it bound to accept the opinions of Drs. Ward and Cherry that were based on the appellant's recitation of his dental history. *See Wood v. Derwinski,* 1 Vet.App. 190, 192 (1991);

---

1. The majority attempts to draw a distinction between hearing damage noticeable during service but not at separation and hearing damage not noticeable either during service or at separation. *Ante* at 123. This is a distinction without a difference, because the veteran's Theory # 2 could encompass either scenario. The important point about Theory # 2 is the contention that hearing damage existed at separation but was not detectable at that time either by the veteran or by the crude audiometric test used in the veteran's separation examination.

2. The BVA cites ENVIRONMENTAL AND OCCUPATIONAL MEDICINE (W.N.Rom, 2d ed., 1992) [hereinafter "Rom"] for the proposition that "most of the damage" to hearing tends to occur "within the first 10 years". R. at 14. However, the BVA takes that statement out of context. The Rom quote refers to the first ten years *of exposure to noise,* not the first ten years after noise exposure ceases. *See* R. at 308.

The BVA also quotes the Rom treatise to the effect that age-related hearing loss begins in the

mid–40s or thereafter, and notes that the veteran "was over 50 when hearing loss was first diagnosed". R. at 14. The graphs from the Rom treatise, R. at 369–70, show that age-related hearing loss in men progresses very slowly from the ages of 20 to approximately age 55–60, and begins to decline at a faster rate only after age 55–60 for all cycles except 4000 Hz, where the decline occurs more evenly. The appellant's contention that he experienced *early* onset of age-related hearing loss (that is, earlier than he, as an individual, would have experienced if he had not suffered noise trauma in service) is thus not rebutted by evidence that a small percentage of men suffer from age-related hearing loss before age 55–60.

Finally, the Board states that the appellant is an "insulin-dependent" diabetic and cites the Rom treatise for the proposition that diabetics are at greater risk of developing hearing loss. R. at 14. However, the appellant asserts that he has the milder, adult-onset type of diabetes, *not* insulin-dependent diabetes. Reply Brief at 4.

*Wilson v. Derwinski*, 2 Vet.App. [614], 618 (1992).

*Owens*, 7 Vet.App. at 433. However, the *Owens* opinion notes in the very next sentence that "the appellant's S[ervice] M[edical] R[ecord]s [SMRs] do not show that teeth numbered 3, 4, 15, and 18 were removed in service", and then concludes: ***"Because the appellant's testimony conflicts with his SMRs,*** the Board's rejection of the doctors' opinions, which were based on dental history related by the appellant, is justified." *Ibid.* (emphasis added). Thus, read fairly, *Owens* does not stand for the proposition that in a case such as this one where the veteran's testimony was not contradicted by SMRs (indeed, where the veteran's SMRs were lost in a fire) the Board may reject physicians' retrospective opinions on the sole ground that they are based on the appellant's recitation of medical history.[3]

Neither do the two cases cited in the majority's quotation from *Owens* (*Wood* and *Wilson*, both *supra*), nor an additional case cited by the majority (*Swann v. Brown*, 5 Vet.App. 229 (1993), *ante* at 121), stand for that proposition. In *Wood*, *Wilson*, and *Swann*, the appellants were seeking service connection for post-traumatic stress disorder (PTSD). Entitlement to compensation for disability relating to PTSD is a special matter because the veteran must prove the occurrence of a stressor—a legal, not medical, requirement. When a physician relies on a veteran's account of a legally insufficient stressor in making a diagnosis of PTSD, that diagnosis can be rejected by the BVA on that ground rather than on the ground that the patient supplied the history. In *Wood*, *Wilson*, and *Swann*, the Court cited evidence indicating that the required PTSD stressor had not occurred.

Moreover, the majority has decided, without discussion or analysis, that the phrase "based on" in *Owens*, *supra*, means "based in part on". This appears to be the first time the Court has taken it upon itself to decide that a physician's consideration of patient history invalidates a diagnosis, notwithstanding the fact that there is evidence of several factors other than patient history considered by the veteran's physician.[4] It is trenching on the area of the expertise of a physician for the Court to state that a physician cannot use history recounted by the patient in reaching a conclusion about the nature or etiology of an illness. A patient's "case history" is generally an integral part of a diagnosis, and physicians are trained to evaluate the credibility of a patient's medical history.[5]

The majority also mischaracterizes the holding of *Elkins*, *supra*, by taking a quotation out of context. Although *Elkins* does hold that a physician's statement was "not material", it did not do so, as the majority suggests, merely because the physician relied on a history related by the veteran. Rather, as *Elkins* expressly stated, it was because the physician's statement was based on the

3. The majority opinion makes much of the fact that the veteran's separation examination did not mention complaints of hearing loss or noise trauma during service. *Ante* at 122. However, the Court's reliance in *Owens v. Brown*, 7 Vet.App. 429, 433 (1995), upon contradiction of the physician's opinion by evidence in SMRs involved actual contradiction, not mere silence in the SMRs. Even more importantly, in *Owens* all of the veteran's SMRs were apparently available, not just a lone separation examination as in the instant case. Silence is inescapable when records do not exist. In this case, placing any weight on SMR silence is unwarranted.

4. The majority's assertion that the physicians' reports were "based upon" the history given by the veteran is not supported by the reports themselves, which do not have a section marked "history", and do not have any statement such as "based on what the veteran told me about his history". Dr. Ator opined that the veteran clearly had noise-induced hearing loss (NIHL) and that he had had no occupational exposure subsequent to service to account for the degree of hearing loss. Dr. Hoover's opinion is apparently based in part on the veteran's description of his symptoms over time, including his military service, but Dr. Hoover does not merely accept the veteran's history as true; he clearly states that the history is consistent with the current clinical picture and cites to other factors. As an example of how the veteran's history is related to clinical findings, both Drs. Hoover and Ator cite undisputed evidence in the record that the veteran has the "notch" audiogram pattern more typical of NIHL than age-related hearing loss. R. at 106, 109, 279, 283, 290.

5. *See* VA PHYSICIAN'S GUIDE FOR DISABILITY EVALUATION EXAMINATIONS § 14.10 (1985), quoted in *Elkins v. Brown*, 5 Vet.App. 474, 483 (1993) (Steinberg, J., dissenting).

"appellant's own account of his medical history and service background, *recitations which have already been rejected by the RO and BVA.*" *Elkins*, 5 Vet.App. at 478 (citing *Reonal v. Brown*, 5 Vet.App. 458, 460 (1993) (emphasis added)).[6]

**B. Treatise evidence.** One other mistake made by the majority in rejecting Theory # 2 is its reliance on the Board's quotation of a passage from Dr. Alberti's article in DISEASES OF THE NOSE, THROAT, EAR, HEAD, AND NECK 1059 (J.J. Ballenger, 14th ed., 1991) [hereinafter "Ballenger"], which states that "hearing loss that progresses after removal from noise exposure is from some other cause". Although this passage might apply to the appellant's Theory # 1, it is irrelevant to Theory # 2. Under Theory # 2, the appellant admits that the postservice *progression* in his hearing loss is due to age-related changes in his hearing, not noise exposure. However, he contends that that progression has made the occult noise-induced damage to his hearing that he asserts he suffered during service become overtly symptomatic. Thus, the excerpt from the Ballenger treatise cited by the majority as rebutting Theory # 2 does not, in fact, contradict that theory in any way.

## II. Board Errors

I believe that this case should be (1) reversed, with the Board directed to award service connection, or (2) at the least, remanded, because the BVA's statement of the reasons or bases for its decision was inadequate.[7]

**A. Reversal.** In support of his Theory # 2, the veteran presented reports from two physicians, specialists in otolaryngology, indicating that his audiograms showed a pattern typical of noise-induced hearing loss (NIHL) and that his hearing loss resulted from noise trauma while serving as a weapons instructor in the Army. R. at 106, 283. One of these specialists opined that the "whisper test" he received in his separation medical examination could not have detected his type of hearing loss. R. at 109.[8] Furthermore, the appellant presented a letter from Dr. Alberti, also an otolaryngologist and the very expert whose article in the Ballenger treatise was quoted extensively and relied upon by the BVA. Dr. Alberti's letter stated that, although damage from noise trauma is not "progressive" after exposure to noise ceases, the damage may not become manifest as noticeable hearing impairment until a person has lost additional "hair cells" during the aging process. R. at 271–72.

In other words, Dr. Alberti's letter clearly supports the appellant's assertion that his hearing was damaged but that he was not aware of it at the time, and that he suffers from age-related hearing loss earlier and more severely than if he had not been exposed to noise trauma. Dr. Alberti characterizes early, severe onset of age-related hearing loss following noise trauma as a "frequent" occurrence. R. at 271. The only evidence apparently cited by the Board in

---

6. *Reonal* made the same holding, noting that the veteran's "recitations ... had already been *rejected* by the [RO]" in a previous final decision and stating: "An opinion based upon an inaccurate factual premise has no probative value".

7. The Board is required to provide a written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable an appellant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Gilbert v. Derwinski*, 1 Vet. App. 49, 57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the

veteran. *See Gabrielson v. Brown*, 7 Vet.App. 36, 39–40 (1994).

8. More accurate hearing-test methods have largely replaced the "whisper" test. VA's own regulations seem to contemplate that scientific advances in examination of hearing disorders require evaluation using the controlled speech discrimination test together with the puretone audiometry test. 38 C.F.R. § 4.85(a) (1994). VA has also recognized that there may be situations where the only available evidence predates the availability of controlled speech discrimination and puretone audiometry testing. 38 C.F.R. § 4.86a (1994) (citing 38 C.F.R. §§ 4.85–4.87 (1987)). This difference between testing methods certainly suggests an imprecision in the testing method used on the appellant's separation examination and warrants further discussion and analysis by the Board.

opposition to the appellant's Theory #2 was the article by Dr. Alberti in the Ballenger treatise.[9] *See* R. at 14–15. The Alberti article does not, however, support the Board's position as to Theory #2.

The Board highlights a sentence in the Alberti article which states that it is error to assume that noise exposure and hearing loss are "necessarily causally related". R. at 13. Both by its plain meaning and in context, that sentence, which follows a discussion of diagnostic criteria for NIHL, is clearly a merely cautionary statement that hearing loss does not invariably result when a person has been exposed to noise. The sentence preceding the Board's highlighted quoted sentence states that when noise exposure has been adequate and other causes of hearing loss have been excluded, it is "customary" to attribute the hearing loss to noise exposure. The Board inexplicably transmutes Dr. Alberti's purely cautionary statement into support for the Board's own conclusion that "the evidence of record does not support the veteran's assertion that hearing loss, like cancer, can first appear many years after exposure to the offending agent has ceased." R. at 15. In fact, that is exactly what the veteran's two medical specialists' reports state, and exactly what Dr. Alberti stated in his explanatory letter.

Indeed, the Board admits that Dr. Alberti's letter points out that "an individual could sustain some degree of hearing loss in service, which would result in later developing hearing loss being noticed earlier" but, incredibly, states that this is an "additive" rather than a "causative" effect, and thus not a ground for service connection. R. at 15–16. If a veteran suffers from a disability earlier than he otherwise would have, due to a service-incurred injury, how can the service-incurred injury be other than "causative"?

The Court has held that it will not reverse the Board on a question of fact unless there is no plausible basis for the Board's finding. *See Gilbert v. Derwinski,* 1 Vet.App. 49, 53 (1990). In this case, the BVA did not cite a plausible basis for rejecting the evidence in support of Theory #2, and there is none.

**B. *Remand.*** Alternatively, I would vacate the decision of the Board and remand the matter for readjudication and a new decision accompanied by an adequate statement of reasons or bases, because the Board did not state a valid reason under our caselaw for rejecting the statements of Drs. Hoover and Ator, and because the Board did not explain why the Alberti article in the Ballenger treatise remained persuasive as to the veteran's Theory #2 in light of the more detailed explanatory letter by the treatise's author on the point at issue. Before the BVA discounts a physician's opinion (let alone the opinions of specialists in the relevant field) on the grounds that the physician is just parroting what the patient said, it should be required to attempt to clarify with the physician the basis of the physician's opinion.

Dr. Ator stated: "The lack of any subsequent occupational noise exposure precludes damage being done subsequent to his military career." R. at 283. However, the BVA opined that the physician-appellant might have had occupational noise exposure because "[m]edical equipment … can produce intense sounds". R. at 16. Given that this is the BVA's supposition, it violates *Colvin v. Derwinski,* 1 Vet.App. 171, 175 (1991) (Board may not rely on its own unsubstantiated medical conclusions to reject expert medical evidence in the record). The Board did not explain why Dr. Ator, as a physician himself, is not presumed to be aware of the occupational noise levels to which physicians are generally exposed.

### III. Conclusion

The logical result of the BVA's decision and the majority's holding in this case as to Theory #2 would be to give the Board license to find a physician's opinion not credible whenever that physician did not examine the patient during service or a presumption period, or did not examine SMRs. This would mean that conditions incurred during service, but not diagnosed until after service,

---

9. I say "apparently" because the Board did not, in its statement of the reasons or bases for its decision, clearly differentiate between the appellant's theories, and correspondingly did not specify what, exactly, the evidence it cited was supposed to rebut.

could never be service connected when SMRs were missing. Another way of looking at this is that, notwithstanding applicable law and regulation allowing a veteran to use current medical evidence to show a "nexus" between a current condition and service,[10] the Board has extended the Court's holdings in such a way as to make it impossible for medical evidence to show such a nexus credibly unless the physician's finding of a nexus is based on the physician's direct observation of the condition during service or review of SMRs (which, in this case, were destroyed). That is not the law at present, and it should not become the law.

For the above reasons, I respectfully dissent.

---

10. When a disease is first diagnosed after service, service connection may nevertheless be established by evidence demonstrating that the disease was in fact "incurred" during the veteran's service, or by evidence that a presumption period applied. *See* 38 C.F.R. § 3.303(d) ("Service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service."); *Combee v. Brown*, 34 F.3d 1039, 1042 (Fed.Cir.1994) ("[p]roof of direct service connection ... entails proof that exposure during service caused the malady that appears many years later"); *Cosman v. Principi*, 3 Vet.App. 503, 505 (1992) ("even though a veteran may not have had a particular condition diagnosed in service, or for many years afterwards, service connection can still be established"); *see also Grottveit v. Brown*, 5 Vet.App. 91, 93 (1993).